**Elliott D. LEVIN, Trustee, Appellant,**

v.

**Cecil Weldon Dean DARE, d/b/a Dare Plumbing Service, Appellee.**

No. IP 96–923–C H/G.
Bankruptcy No. 96–00919–FJO–7.

United States District Court,
S.D. Indiana,
Indianapolis Division.

Nov. 19, 1996.

Elliott D. Levin, Trustee, Rubin & Levin, Indianapolis, IN.

David A. Mathies, Indianapolis, IN, for Appellee.

## ENTRY ON APPEAL FROM BANKRUPTCY COURT

HAMILTON, District Judge.

This appeal from a decision of the bankruptcy court presents one narrow question of law. For purposes of the exemptions of a debtor's property from a bankruptcy estate set forth in Ind.Code § 34–2–28–1, should United States currency be treated as "tangible personal property" or as "intangible personal property"? Currency does not fit neatly into either category of property, and the statute does not give a clear answer. In related areas of the law, currency is treated sometimes as tangible property and some-

times as intangible property. In view of (a) the ambiguity of the statutory terms as applied to currency, (b) the inconsistent treatment of currency in related areas of law, and (c) the Indiana courts' longstanding policy of construing exemption statutes liberally in favor of debtors, the court holds that currency should be treated as tangible personal property for purposes of Ind.Code § 34–2–28–1. The court therefore affirms the judgment of the bankruptcy court in this case and agrees with unpublished decisions by District Judge Lee and Bankruptcy Judge Grant of the Northern District of Indiana. See *In re Koehl,* No. F 88–242 (N.D.Ind. Nov. 1, 1988), *aff'g In re Koehl,* No. 87–10550 (Bankr. N.D.Ind. July 8, 1988).

### Background

Indiana has opted out of the federal bankruptcy exemptions provided in 11 U.S.C. § 522(d). It has chosen instead to establish by state statute the property exemptions for individual debtors domiciled in Indiana. See Ind.Code § 34–2–28–0.5; *In re Ondras,* 846 F.2d 33, 34 (7th Cir.1988) (upholding validity of Indiana exemption statute). The Indiana statute provides an exemption for real estate (other than a personal residence) and for "tangible personal property" totalling $4,000 in value. Ind.Code § 34–2–28–1(a)(2). The statute provides an exemption for "intangible personal property" totalling only $100 in value. Ind.Code § 34–2–28–1(a)(3).

When debtor Cecil Dare, d/b/a Dare Plumbing Service, filed his petition under Chapter 7 of the Bankruptcy Code, he had on hand $2,000 in cash in various denominations of United States currency. He listed the currency as tangible personal property and claimed that it was exempt from his bankruptcy estate. The trustee objected and argued that the cash was intangible personal property and that the exemption should be limited to only $100. The bankruptcy court agreed with the debtor and ruled that the currency should be treated as tangible personal property subject to the $4,000 limit.[1]

---

1. Dare had also listed other items as exempt tangible personal property. The total value of the currency and those items was $4,500. Because the debtor claimed exemption for a total of $4,500 of property treated by the bankruptcy court as tangible personal property, the bankruptcy court ordered him to select $500 worth of listed items to be excluded from the exemption.

The trustee appeals. On the controlling issue of law, this court must decide the question *de novo*.

### Discussion

The Indiana exemption statute does not specifically define the terms "tangible" and "intangible" personal property. In any individual case, the stakes that depend on this question of law are relatively modest, so the published case law interpreting the statute on this question is perhaps understandably sparse, conclusory, and conflicting. The only reported Indiana case interpreting the statute is *Myles v. Flora*, 462 N.E.2d 1319 (Ind.App.1984), where the Indiana Court of Appeals applied Ind.Code § 34–2–28–1 to a deposit in a savings and loan institution. The court said that intangible personal property is "property which has no intrinsic value but is merely representative or evidence of value, such as stock certificates, bonds, or promissory notes." *Id.* at 1320. Without more directly applicable guidance from the legislature, the court turned to the now-repealed intangibles tax statute, see Ind.Code § 6–5.1–1–1 (1988), which defined "intangible" as including "a deposit of money" and stock in a savings and loan or a building and loan. *Id.* The court held that the debtor's savings and loan deposit was intangible personal property for purposes of the exemption statute, then said that the debtor's "basic premise that the deposit was cash or money is erroneous." *Id.* at 1321. The court therefore did not decide whether, if the deposit had been "cash" or "money," it would have been treated as tangible or intangible personal property. Thus, *Myles* provides little guidance for this case.

The debtor and the bankruptcy court have relied on *In re Hansen*, 101 B.R. 33, 36 (Bankr.N.D.Ind.1988). Bankruptcy Judge Grant held in *Hansen* that cash was tangible personal property subject to the $4,000 limit, while deposits with financial institutions were intangible personal property subject to the $100 limit. The trustee relies on *In re Weaver*, 93 B.R. 172, 176 (N.D.Ind.1988), where Judge Lee held that the debtor's cash and bank deposits together were intangible personal property subject to the $100 limit.

These two published opinions are of limited persuasive value on this question, however, for both *Hansen* and *Weaver* dealt primarily with other issues and did not explain their conflicting conclusions on this particular issue. In addition, in *Weaver*, the debtors did not even appear in the district court, leading Judge Lee to note that their absence made it more difficult for the court to evaluate the merits of the case. 93 B.R. at 174. Also, there was apparently no dispute over the treatment of currency. See 93 B.R. at 176.

More persuasive are the more detailed opinions in *In re Koehl*, an unpublished case from the Northern District of Indiana, which the bankruptcy court relied on here. In *Koehl*, Bankruptcy Judge Grant held that currency should be treated as tangible personal property subject to the $4,000 limit in the statute. Judge Grant found the statute to be ambiguous, and observed correctly that the standard dictionary definitions of tangible and intangible property "shed more darkness than light" on the specific question and that "cash does not fall neatly within the scope of any of these definitions." In the absence of more specific guidance, he followed a statement of the Supreme Court of the United States in *Blodgett v. Silberman*, 277 U.S. 1, 48 S.Ct. 410, 72 L.Ed. 749 (1928). There the Court considered whether Connecticut could impose a transfer tax on property, including some cash, owned by one of its residents but located in another state. The Court said:

> As to this, the contention on behalf of Connecticut, is that cash should be treated as attached to the person of the owner and subject to a transfer tax at the domicil. It is argued that it was not like coin or treasure in bulk, but like loose change, so to speak. To money of this amount easily carried on the person, it is said that the doctrine of *mobilia sequuntur personam* [movables follow the person] has peculiar application in the historical derivation of the maxim. But we think that money so definitely fixed and separated in its actual situs from the person of the owner as this was, is tangible property and can not be distinguished from the paintings and furniture held in [*Frick v. Pennsylvania*, 268 U.S. 473, 489, 45 S.Ct. 603, 604–05, 69

L.Ed. 1058 (1925) ] to be taxable only in the jurisdiction where they were.

277 U.S. at 18, 48 S.Ct. at 416 (explanatory phrase added). Judge Grant noted that currency had also been treated as tangible property for taxation purposes in *Beery v. Los Angeles County,* 116 Cal.App.2d 290, 253 P.2d 1005, 1008 (1953) (following *Blodgett* ), and *In re Waldron's Estate,* 84 Colo. 1, 267 P. 191, 194 (1928) (following *Blodgett,* "cash is tangible property available for use in the hands of any possessor whether it be coin, government notes, or bank notes"); see also *State ex rel. Wolfe v. Parmenter,* 50 Wash. 164, 96 P. 1047, 1050 (1908) ("money in practical commercial operations possesses such value by immediate purchasing or exchange powers that it in effect robs it of a mere representative character and clothes it with the dignity of property having intrinsic value"). Judge Grant also relied on *In re Midas Coin Co.,* 264 F.Supp. 193, 197–99 (E.D.Mo.1967), *aff'd,* 387 F.2d 118 (8th Cir. 1968) (*per curiam* ) in which the court noted that Article 9 of the Uniform Commercial Code lists money as a separate category of personal property, distinct from "general intangibles."

On appeal to the district court in *Koehl,* Judge Lee agreed with the bankruptcy court's analysis and added:

Since the 1898 decision of the Indiana Supreme Court in *Pomeroy v. Beach,* 149 Ind. 511 [49 N.E. 370] (1898), the courts have consistently adhered to the edict that exemption statutes must be construed liberally in favor of those for whose benefit they were enacted. *See In re Summers,* 253 F.Supp. 113, 115 (N.D.Ind.1966); *H.C. Smith Coal Co. v. Finley* [190 Ind. 481], 131 N.E. 5 (Ind.1921); *Miller v. Swhier* [40 Ind.App. 465], 79 N.E. 1092 (Ind.App. 1907). Exemption statutes are based upon considerations of public policy for the benefit of debtors and their dependents. *H.C. Smith Coal Co., supra* [131 N.E.], at 8. Construing I.C. 34–2–28–1 liberally so as to benefit the debtors leads to the conclusion that cash is tangible personal property. This construction allows debtors the

maximum exemption for the most useful of their personal property—cash.

*In re Koehl,* slip op. at 4.

The question of law here is a question of state law—ultimately a matter of statutory interpretation. The Indiana exemption statute provides no further gloss on the key terms, "tangible personal property" and "intangible personal property," and this court must decide whether it is persuaded that the opinions in *In re Koehl* reached the correct result. The trustee and debtor argue that the court should be guided by several other sources, including other Indiana statutes, dictionary definitions, and case law interpreting the key terms in other contexts, such as wills, taxation statutes, and insurance policies.

■ *Statutory Guides:* In construing words in a statute, the legislative definitions of the same words in a statute dealing with the same or a related subject may be some evidence, although not conclusive evidence, of the terms left undefined. *E.g., Kimco Leasing, Inc. v. State Bd. of Tax Comm'rs,* 656 N.E.2d 1208, 1213–14 & n. 9 (Ind.Tax Ct.1995) (interpreting term "security interest" in property tax statutes in light of definitions in commercial code); *Adkins v. Ind. Employment Sec. Div.,* 117 Ind.App. 132, 70 N.E.2d 31, 33 (1946). Citing this principle of statutory construction, the trustee suggests that the court consider the Indiana statutes dealing with treatment of unclaimed property. Those statutes include "money" as the first example of "intangible personal property." Ind.Code § 32–9–1–3(g)(1) (repealed 1995); Ind.Code § 32–9–1.5–17(b)(1) (enacted 1995).

The General Assembly has also drawn distinctions between tangible and intangible personal property in several tax statutes. One is the Indiana inheritance tax. See Ind. Code §§ 6–4.1–2–2 and –3. The statute defines "tangible personal property" to mean "corporeal personal property, such as goods, wares, and merchandise." Ind.Code § 6–4.1–1–13. "Intangible personal property" is defined to mean "incorporeal property, *such as money,* deposits, credits, shares of stock, bonds, notes, other evidences of indebtedness, and other evidences of property inter-

ests." Ind.Code § 6–4.1–1–5 (emphasis added).

The distinction between tangible and intangible personal property is also important in the Indiana retail sales and use tax and Indiana property tax. The retail sales tax is imposed on retail transactions made in Indiana, Ind.Code § 6–2.5–2–1, and a retail transaction is one that involves the sale of "tangible personal property," Ind.Code § 6–2.5–4–1(b). Similarly, the parallel use tax is imposed on the storage, use, or consumption of "tangible personal property" in Indiana if the property was acquired in a retail transaction. Ind.Code § 6–2.5–3–2(a). Currency is certainly not "tangible personal property" for purposes of the retail sales tax or use tax. It simply would make no sense to think of "buying money" in a retail transaction. Rather, the tax is imposed on retail transactions in which money is *exchanged for* tangible personal property.

The distinction between tangible and intangible personal property is also relevant for Indiana property taxes, which apply to real and personal property. See Ind.Code § 6–1.1–2–1 (imposing tax on "tangible property" within the state's jurisdiction), and Ind. Code § 6–1.1–1–19 (defining "tangible property" as "real property and personal property as those terms are defined in this chapter"). The statute in turn defines "personal property":

(a) Subject to the limitation contained in subsection (b), "personal property" means:

(1) nursery stock that has been severed from the ground;

(2) florists' stock of growing crops which are ready for sale as pot plants on benches;

(3) billboards and other advertising devices which are located on real property that is not owned by the owner of the devices;

(4) motor vehicles, mobile houses, airplanes, boats not subject to the boat excise tax under IC 6–6–11, and trailers not subject to the trailer tax under IC 6–6–5;

(5) foundations (other than foundations which support a building or structure) on which machinery or equipment is installed; and

(6) *all other tangible property* (other than real property) which is being:

(A) held for sale in the ordinary course of a trade or business;

(B) held, used, or consumed in connection with the production of income; or

(C) held as an investment.

(b) Personal property does not include commercially planted and growing crops while they are in the ground.

Ind.Code § 6–1.1–1–11 (emphasis added). By definition the property tax does not apply to intangible property, and it does not apply to cash. (Otherwise there would be little point in the so-called "tax sales" that many Indiana businesses conduct each year just before their inventories are assessed for property tax purposes.)

On the other hand, Article 9 of the Uniform Commercial Code, enacted in Indiana as Ind.Code § 26–1–9–101, *et seq.*, treats money as a distinct category of property, distinguishing it from both "goods" and "general intangibles." See Ind.Code §§ 26–1–19–105(1)(h) (excluding "money" from definition of "goods") and –106 (excluding "money" from definition of "general intangibles"); see also Ind.Code §§ 26–1–19–304 & –305 (security interest in money is perfected by possession, without filing, unlike the filing requirements for security interest in goods or certificated securities, for example).

Thus, other Indiana statutes distinguish between tangible and intangible personal property in ways that generally treat currency as intangible property, but it is treated as tangible property, or at least as "not-intangible" property, for other purposes. These other statutes offer some support for the trustee's argument that currency should be treated as "intangible personal property" for purposes of Ind.Code § 34–2–28–1. But the inconsistent treatment of currency in some other Indiana statutes suggests that treatment under other statutes provides only a relatively weak basis for choosing one interpretation over another in the bankruptcy exemption statute.

*Dictionary Guidance:* Both sides have also addressed the definitions of "intangible" and "tangible" personal property in Black's Law Dictionary, for such dictionary definitions may provide guidance about the legislature's likely intention in using the key terms. Black's defines "intangible property" as "such property as has no intrinsic and marketable value, but is merely the representative or evidence of value, such as certificates of stock, bonds, promissory notes, copyrights, and franchises." Black's Law Dictionary at 809 (6th ed. 1990). It defines "tangible property" as "property that has physical form and substance and is not intangible." The debtor points out that currency is tangible in that it has, of course, physical form. It is special paper with ink on it. The trustee counters that the essence of currency is not its (modest) physical form but the fact that it is widely recognized as legal tender for public and private debts and as a medium of exchange for goods and services. In this the trustee is correct.

United States currency no longer has "intrinsic" value, at least as that term is generally used in the law. (Economists may view differently the question of "intrinsic" value.) The value of United States currency lies in the fact that it is very widely acceptable as a medium of exchange for goods and services. That acceptance is based, of course, on the stability of the United States government, the strength of the economy, the relative stability of the money supply, and the relative difficulty of counterfeiting the currency. The value of the currency has no relationship to the paper and ink used to produce the currency (or the metal used to produce coins, at least since the government stopped minting silver coins except as collectors' items).[2]

However, the value that currency has as a medium of exchange is still tied closely to its physical form. The pieces of paper used as currency are treated as if they somehow *are* the value they represent, and that value cannot be removed from the physical piece of paper—the "representative" value of the currency moves with the currency itself from one hand to the next. When the physical Federal Reserve Note is destroyed, its value is irretrievably lost, which is not the case, of course, with checks, promissory notes, or stock certificates. Currency simply does not fit neatly into the abstract legal categories of tangible and intangible property.

*Case Law Guidance:* In trying to determine the legislature's intent as applied to currency, the parties have argued that the court should also consider case law interpreting similar language for other purposes, such as the interpretation of similar language in wills, taxation statutes, or insurance policies. Some of the cases shed interesting light on the problem here, but, as discussed below, the most significant finding in the case law is how inconsistent the treatment of currency is when courts have tried to categorize it as tangible or intangible. Some cases treating currency as tangible property were noted above in the discussion of Judge Grant's opinion in *Koehl.* A number of other cases have treated currency as intangible.

For example, in *Estate of Larson,* 196 Wis.2d 231, 538 N.W.2d 802 (App.1995), the decedent's will gave her "tangible personal property wherever located" to her surviving children in equal shares. The issue before the appellate court was whether this bequest of "tangible personal property" included the decedent's bank accounts, certificates of deposit, annuity and trust proceeds, and cash on hand. The Wisconsin court found that all of these items, including the cash, should be treated as intangible property. 538 N.W.2d at 803. In the absence of more definitive guidance from definitions in the will, the court based its decision on the dictionary definitions in Black's and on the use of the key terms in Wisconsin statutes, including those dealing with unclaimed property (which treat cash and the other forms of property as intangible), income taxation of trusts, and the general sales and use tax. *Id.*

---

**2.** Of course, Congress has the power to issue paper currency and to regulate its value. U.S. Const. Art. 1, § 8, cl. 5; *Knox v. Lee ("Legal Tender Cases"),* 79 U.S. (12 Wall.) 457, 540–43, 20 L.Ed. 287 (1871). As governments of other nations have seen during periods of hyperinfla-tion, when people have lost confidence in a currency and turned to barter or to other mediums of exchange, there are practical limits on the power of a government to establish the value of currency by fiat.

Similarly, in *In re Pergament's Estate*, 204 Misc. 384, 123 N.Y.S.2d 150 (N.Y.Sur.Ct. 1953), *aff'd*, 283 A.D. 869, 129 N.Y.S.2d 918 (1954), the decedent's will left to his wife "all personal effects, household effects, automobiles and other tangible personal property." At the time of his death, the decedent's safe deposit box contained $28,600 in cash. The issue was whether that cash was "other tangible personal property." The court held that the cash was not "tangible personal property," commenting that cash "is not ordinarily thought of as 'tangible personal property.'" 123 N.Y.S.2d at 153–54.[3]

A third will case serves as a bridge to other cases dealing with valuable coins, which offer an interesting variation on the problem here. *Estate of MacFarlane*, 313 Pa.Super. 397, 459 A.2d 1289 (1983), also dealt with a will that gave all the decedent's "tangible personal property" to his wife. The decedent's property included more than 5,000 gold and silver coins. The trial court ruled that the coins were tangible personal property and the appellate court agreed. The decedent had acquired the gold and silver coins not as a numismatic collector but as an investor seeking a hedge against inflation and economic collapse. Applying definitions essentially identical to those in Black's, the appellate court observed that the gold and silver coins were clearly tangible, in that they could be felt or touched, but the critical point was that the coins had "both intrinsic and marketable value in and of themselves," and therefore were "more than the mere representation or evidence of value, as opposed to stock certificates *or paper currency*." 459 A.2d at 1292 (emphasis added).

Different lines have been drawn in other cases dealing with the taxation of coins. In *Thorne & Wilson, Inc. v. Utah State Tax Comm'n*, 681 P.2d 1237 (Utah 1984), the taxpayer was an investment broker/dealer that sold, among other investment products, precious metals, bars, medallions, and gold and silver coins of several nations. The Su-

preme Court of Utah held that the sales of these items were sales of "tangible personal property" subject to the state sales tax. The court reviewed decisions from other states dealing with the same question and found that whether the sales tax applied turned on whether the transaction was a commodity or a money transaction: "It must be determined whether the coins were purchased for their tangible value, the value of the precious metal, or for their intangible value as a medium of exchange, the value established irrespective of the value given the precious metal." 681 P.2d at 1238, quoting *Scotchman's Coin Shop, Inc. v. Administrative Hearing Comm'n*, 654 S.W.2d 873, 875 (Mo.1983). By way of comparison, no one suggests that, when a person brings 40 quarters in a roll to a bank and exchanges them for a $10 bill, a taxable "sale" of the quarters has occurred. The Utah court concluded that when coins are "sold for their intrinsic value and their face value is not significant, they are tangible property." 681 P.2d at 1239.

The Supreme Court of Ohio reached a similar result in *Losana Corp. v. Porterfield*, 14 Ohio St.2d 42, 236 N.E.2d 535 (1968), and drew a line between transactions in "currency" and sales of coins for more than their face value. The sales tax statute there specifically provided that "money in all its forms is intangible personal property, the sale or exchange of which is not subject to" the sales tax. 236 N.E.2d at 538. "Money" was defined to include gold, silver, and other coins, circulating notes of national banking associations, United States legal tender notes, and other notes and certificates of the United States, payable on demand and circulating or intended to circulate as currency. *Id.* The court had little difficulty concluding that the rare coins being bought and sold by collectors for prices higher than their face values were not "currency" or "money" and were therefore tangible personal property for sales tax purposes. *Id.*

**3.** Several other factors also contributed to that conclusion. The court said it was "at least a striking coincidence" that the amount of cash was precisely the sum of legacies to various individuals in other articles of the will, and the decedent had made other provisions for his wife.

Also, in light of the entire phrase in the will, the court applied the principle of *ejusdem generis* to limit "tangible personal property" to property similar in character to personal effects, household effects, and automobiles. 123 N.Y.S.2d at 153–54.

A similar issue arose not in a tax case but under Article 9 of the Uniform Commercial Code. In *In re Midas Coin Co., supra,* the debtor was a dealer of stamps and coins. The issue was whether its inventory of coins should be treated as "money" or as "goods." The difference was critical to whether the creditor had perfected a security interest in the coins. The district court treated the coins like any other "tangible personal property," but only because the coins had appreciated in numismatic value and were commodities for sale for more than their face values. Precisely because the debtor was a stamp and coin dealer, the coins were commodities, not a medium of exchange. 264 F.Supp. at 196–97.

These coin cases are instructive here because they forced courts to consider the nature of money. *MacFarlane* distinguished between coins using valuable metals and "debased" coins using base metals. *Thorne & Wilson* and *Losana Corp.* indicated that when coins (regardless of the metal they are made from) are treated merely as a medium of exchange, they should be treated like paper currency, which those courts treated as intangible property. Only when the coins were treated as something more than a medium of exchange, when the coins had economic value greater than the "face" or exchange value, were these courts willing to treat the coins as tangible personal property more akin to jewelry, stamp collections, artwork, or tools. Contrary to the cases cited in *Koehl,* the reasoning of these cases points in favor of treating currency as intangible personal property under the Indiana exemption statute.

Many insurance policies have also used the term "tangible property," and courts have considered the scope of that term as applied to currency or other assets. Several decisions have acknowledged the possibility that loss or destruction of currency could be considered loss or destruction of tangible property. See *e.g., Security State Bank of Kansas City v. Aetna Cas. & Sur. Co.,* 825 F.Supp. 944, 947 (D.Kan.1993); *Travelers Indem. Co. v. State,* 140 Ariz. 194, 197, 680 P.2d 1255, 1258 (App.1984); *Temco Metal Products Co. v. St. Paul Fire & Marine Ins. Co.,* 273 Or. 716, 543 P.2d 1, 2 (1975); see also *Paddleford v. Fidelity & Cas. Co. of New York,* 100 F.2d 606, 613 (7th Cir.1938) (brokers' fidelity bond protected against loss of "money, currency, bullion," etc. held to cover intangible losses caused by employee dishonesty), *overruled on other grounds, Continental Corp. v. Aetna Cas. & Sur. Co.,* 892 F.2d 540 (7th Cir.1989); *Degener v. Hartford Acc. & Indem. Co.,* 92 F.2d 959, 960–61 (3d Cir. 1937) (broker's fidelity bond against theft of "money, currency, bullion," etc. held limited to theft or other loss of "tangible articles, such as those mentioned in the bond"). The insurance cases are good reminders about the need to interpret language in context. In the insurance context, the physical, tangible character of currency may be critical, as in the case of destruction, for as the district court explained in *Security State Bank,* the moment that currency "is destroyed an irreversible loss of wealth has occurred. The destruction or loss of a check or other debt instrument is a different matter." 825 F.Supp. at 947.

This review of other statutes and case law may show only that the body of Indiana and American law provides both sides here with good, but relatively abstract, arguments in their favor. To return to the task of statutory interpretation here, the most salient point is that there is no especially powerful textual or case law argument in either direction. Under these circumstances, the best guidance available come from the specific statutory context and the practical implications of alternative interpretations. As Judge Lee observed, Indiana courts have a longstanding practice of construing exemption statutes liberally in favor of the debtors for whose benefit they were enacted. *In re Koehl,* slip op. at 4. That principle was "well settled" by 1898 when the Supreme Court of Indiana said:

It has been uniformly held in this State that the constitutional provision relating to exemptions, the statutes passed pursuant to the requirements thereof, were based upon considerations of public policy and humanity; and it was not alone for the benefit of the debtor, but for his family also, that such laws were enacted, and the

same should be liberally construed. *Kelley v. McFadden,* 80 Ind. 536, 538 [ (1881) ]; *Astley v. Capron,* 89 Ind. 167, 170 [ (1883) ]; *Butner v. Bowser,* 104 Ind. 255 [259–60, 3 N.E. 889 (1885) ]; *Junker v. Hustes,* 113 Ind. 524 [16 N.E. 197 (1888) ]; *Chatten v. Snider,* 126 Ind. 387 [389–90, 26 N.E. 166 (1890) ], and cases cited; *Citizens State Bank, etc. v. Harris,* [149 Ind. 208, 48 N.E. 856 (1897) ]; 7 Am and Eng.Ency. of Law, 130 and 131.

In *Chatten v. Snider, supra,* this court said: "It is well settled that exemption laws are to be liberally construed, with the view to favoring the judgment debtor, and the exemption is not alone for the benefit of the debtor, but for his family as well, and that such construction should be given thereto as will save the debtor and his family at all times the full exemption which the law bestows."

*Pomeroy v. Beach,* 149 Ind. 511, 515, 49 N.E. 370 (1898). Accord, *In re Summers,* 253 F.Supp. 113, 115 (N.D.Ind.1966); *H.C. Smith Coal Co. v. Finley,* 190 Ind. 481, 131 N.E. 5, 8 (1921); *Miller v. Swhier,* 40 Ind.App. 465, 79 N.E. 1092, 1093 (1907); see also *In re Fogel,* 164 F.2d 214, 216 (7th Cir.1947) (interpreting Indiana exemption and explaining that exemption statutes must be liberally construed for benefit of debtors).

In *Koehl,* Judge Grant added some important observations on the practical side of the question presented here. In that case the two debtors had each used their entire $4,000 exemptions for a total of $8,000 cash. The court noted that the debtors also owned clothing, miscellaneous household goods, furnishings, and other tangible personal property. As the Indiana exemption statute is written and interpreted, these items and cash must be treated under the same exemption category, so Judge Grant commented that the debtors' choice to protect $8,000 in cash meant the trustee had "not only the right but also the duty to liquidate" these other assets, and "can and must consider literally taking the shirt off of the debtors' back." The court continued:

> We wonder whether or not the debtors will be able to replace the items, which are not only necessary for their day-to-day

living but also the production of income, with the money they have chosen to protect. For this reason, the court doubts the wisdom of what the debtors have chosen to do, even though they are legally entitled to do it. It is entirely possible that they will leave this court deprived of their livelihood and naked, without so much as a pocket to put the exempted cash into.

Slip op. at 9. Putting aside the wisdom of the Koehls' use of the exemption, treating currency as tangible personal property under the statute permits a prudent debtor to select a modest combination of clothing, furniture, kitchen equipment, other personal belongings, tools, and cash to continue day-to-day living and, one hopes, finding or earning a livelihood. This interpretation allows the debtor to make the decision about how to balance cash (needed, perhaps, to pay a security deposit and month's rent on a new place to live) against more obviously tangible items needed to keep going.

If cash is treated as intangible property under the exemption statute, the debtor is limited to $100. That result could leave the debtor and family with a collection of used clothing, furniture, kitchen supplies, tools, and the like, but without the ability even to rent a modest new apartment. While the Indiana legislature certainly has the power to write the exemption statute toward that end, its reliance on the terms "tangible" and "intangible" property has not made that intention sufficiently clear to preclude the more liberal interpretation in favor of debtors.

### Conclusion

Unlike Congress, the Indiana legislature has chosen to use the legal distinction between tangible and intangible property to establish exemptions from a bankruptcy estate. As applied to many forms of property, that distinction is clear and easy to apply. As applied to currency, however, it is not. Currency seems to straddle this divide in the law, for it has some characteristics of both tangible and intangible property, and the law treats it as different types of property for different purposes. When it is important to be able to predict more accurately the legal treatment of currency, it is essential (and not

difficult) to write a statute, a will, a contract, or an insurance policy to make the intended treatment clear. In the absence of more definitive guidance in the Indiana statute, this court follows the Indiana policy of construing exemption statutes liberally, follows the holding of the Northern District of Indiana, and holds that the debtor's currency should be treated as tangible personal property for purposes of Ind.Code § 34–2–28–1. If these federal interpretations of this Indiana statute do not accurately implement the Indiana legislature's intentions, clarification of the exemption statute should not be difficult. The judgment of the bankruptcy court is affirmed.